Mr. Hacker, when you are ready. Good morning, Your Honors, and may it please the Court, I believe I reserve five minutes for rebuttal. I'd like to focus the short time I have this morning on the two dispositive contractual issues in this case. The first is Lenar's right to property with no undisclosed history of hazardous materials storage or disposal. And second is its right to access that property up to closing to identify any unknown environmental problems. I'll start with the historically used condition because it's the simplest reason Lenar was not required to close on May 27th. Under Section 11A of the agreement, Lenar was required to close only if the following fact about the property, among others, was, quote, true and correct in all material respects, except as previously disclosed, quote, no portion of the property has been used for the storage, use, generation, treatment, or disposal of hazardous materials. So how much hazardous materials would meet these contractual requirements? I'm sorry? What level of hazardous materials was required to meet that condition of the contract? The key, Your Honor, is to focus on the language with Romanet 2, which focuses on the past, the past disposal or storage of hazardous materials. The current level is literally irrelevant to that question. Romanet 1 is the first condition, the first fact that has to be true about the property, and that Romanet says there are, quote, there are not hazardous materials located on or within the property. Romanet 2 talks about the past use, and it says that no portion of the property has been used, and that fact was not true in all material respects. It wasn't true, Your Honors, in any material respect. So your reading of that provision would be if there were some hazardous materials deposited 100 years ago that are no longer present, that that was a sufficient breach to warrant your not performing? The question would be whether or not the statement that are the – Perhaps you could directly answer Judge Agee's question. Yes or no. The answer – the only reason I can't answer yes or no is it depends on how much there was in the past and whether or not that renders the statement no portion has been used true and correct in all material respects. We're not talking – What difference would that make, though, if there were 10 tons of hazardous waste XYZ deposited in 1917 and now in 2017 they're all gone for whatever reason, what difference does it make? Well, the parties thought it made a difference because they have two separate provisions. Provision 1 deals with whether or not there's a problem today. Provision 2 is what happened in the past. And the question is, in every case, whether or not the statement, this never happened in the past. That's what the statement is. Never happened in the past is true and correct in all material respects. I will happily concede that at some point in the distant past, a small amount may not render that statement. It's never happened in the past, not true in all material respects. But, Your Honor, let's focus on – Excuse me. What does the term in all material respects mean? Because you keep repeating that contractual term and you really haven't yet given us any context for that. You know, the district court clearly thought that materiality went to the ability to develop the property for its intended purpose. And you seem to be taking issue with that very basic principle. So what does that term mean and what is your support for your position regarding that term? I think it would be the standard question whether or not a given statement, the statement here being no portion has been used for disposal, whether or not that is not true. Something about that statement is not true in a material way. So, for example – Why was the district court's construction of materiality erroneous as a matter of law? Because she focused – she reads that provision, the historical use condition, completely out of the contract by focusing on whether or not there are hazardous materials on the property today. That's what the first Romanette is all about. Maybe it would help us get to an answer of some usable sort if you told us what specifically the district court did wrong in this regard. Well, what specifically the district court did wrong was focus on whether or not today – there's a number of errors she made, but I would say the simplest is focusing on whether or not today there is a material, in her view, amount of hazardous materials on the property. And that is wrong because? Because it reads Romanette 2 out of the contract. No, it reads it differently because it says in any material – materiality is expressly a part of the phrase that you keep reading to us. Right. But the question she should have been asking is if we're going to look at it purely about whether or not it's a material amount, materiality from the perspective of a purchaser today, I still think that's the wrong question in terms of the statement being not materially true. But even if we are, the question has to be would it have been material to a residential purchaser, or more specifically to a purchaser of the land developing it for residential purchasers, that thousands of tons, thousands of tons of sewage sludge had been dumped on the property in the 1970s and 1980s and nobody told them about it. Even if, even if there are not currently elevated amounts of hazardous materials on the property today, would the purchaser of this property, Lenar, when they came into the deal, would it have been material to them to know that when they were told it was not, this had not happened, that in fact thousands of tons of sewage sludge had been dumped on the property all over the property in the 1970s and 1980s. Would that have been material? It was material because the contract says it is by separating it out as a second Romanette. But further, what they're concerned with is stigma damages, Your Honors. It doesn't say sewage sludge. It just uses this amorphous term, you know, materials. So I know now after the fact that certainly your client considers this to be material, at least for purposes of this litigation, but why is it? Well, several reasons. First of all, what it's addressing is a stigma damage. Residential home buyers don't want to necessarily want to buy a house on property that was used to dispose of thousands of tons of sludge, you know, in the 10 or 15 years before they purchased the house. They don't want to know what, you know, an environmental report says about the current level of arsenic on the property. They just want to know that their house is built on thousands of tons of sewage sludge being deposited in that area. It's a term in the real estate industry called stigma damages. They just don't want to deal with that. The other point is sewage sludge is not just a general phrase. It's qualitatively material because hazardous materials are defined in the agreement as hazardous waste, hazardous substances, and toxic materials prohibited or regulated by Federal, State, or local law, regulation, or order. And this is the second error that the judge made, Your Honor. Let me just stay with the first one just for a moment. Part of the difficulty that I'm having with your argument generally is there's very much an ex post facto quality to it because you had an opportunity to investigate before with the initial environmental study, and this concern seems to crop up with a certain urgency consistent with a litigation posture. So that's part of what gives me pause. Do you have? Let me answer that directly. You're chomping at the bit. Go right ahead. The judge herself recognized that that was not a problem in the first summary judgment order. That's fine. Let me give you the law that she cites too. No, I'm asking you. All I'm saying is as a matter of law, it doesn't matter that this problem arose. Now, we found out about it. We began to find out about it right before the closing. But then when we did not close, there was a claim of breach against us. And now the law is perfectly clear. The Glenn L. Martin case says if the act of one party to a contract gives the other a legal defense to the performance of his contractual obligation, the latter can rely upon that defense even though he was ignorant of it and failed to perform for a different reason. That's the law. That's the law in Maryland. That's the law in the United States Supreme Court. And that's the law the court below applied. My question goes to something a little bit different, and that is a good faith failure to investigate. That was all. It's not susceptible of response by citing a case. I was just telling you one of my concerns in the hopes that you could help assuage it. I'm very happy to address the good faith failure response. And all I meant to be saying is as a matter of law, even if we had other reasons and didn't investigate, if this is true, if it turns out that in fact this required environmental condition representation is a false representation in a material respect or is not true, then it doesn't matter what our reasons were. That was my first answer. I did mean to be addressing your question very specifically. But I will take the opportunity to turn to the independent ground, which is the seller's denial of our unambiguous right of access to the property. You were granted a right to access during the cure period, were you not? Yes. Yes, but judicially. No, contractually. You were granted the right of access during the cure period. By the court, that's correct. Yes. That's right, but it doesn't affect whether or not we should have shown up on May 27th. We were not granted by the court, and the sellers didn't agree until June 30th. You were given the right. The sellers communicated separately from the court order that you were granted access. In fact, there is information in the record, if I'm correct, that whether it was your firm or somebody else on behalf of your client, was affirmatively trying to push the court's action off until after the cure date. Moved from the continuance of the. So that would not come to pass, but it didn't. So you had the opportunity to access the property, and if I'm reading the record correctly, you never did. So it's kind of hard to give much credence to your argument here. Well, first of all, it doesn't go to the environmental condition point. It's completely separate. Second of all, it's not quite accurate to say we had the opportunity to access and never did. We wanted access before May 27th. In that five-month period, we asked over and over again, in order to conduct all appropriate investigations as authorized by CERCLA to claim the innocent purchaser defense. That's the reason we cited. And when the cure period came after May 27th, that can't retroactively say that we were in breach for not showing up on May 27th. A contract that gave you a cure period, provided for a cure period, which had not expired at the time you were granted access. Correct? That's correct. Well, yes. But that doesn't establish that we were in breach on May 27th. That would show that they were not in breach for not letting us on the contract. Please, Judge Elkin, I want to address the concern. How do you deal with the district court's factual finding that you didn't make your request in good faith? I mean, how is that clearly erroneous? In our view, it's not a factual finding. It's a legal error to say that it's an act of bad faith to want to exercise the contractual right, in this case, according to the judge, in the hopes of finding an environmental problem that could allow us to escape the contract. That's what the access right is all about. She says this. No, why isn't that factual? She's talking about your intent. She's saying that you weren't intending to really conduct a thorough investigation of the property for your own purposes. You were doing it to get out of the contract. And why isn't that factual? I may have misspoken. We're not contesting that factual part of it. We accept, for the purposes of this appeal, that our interest, as she found, was to access the property to identify an environmental problem that would allow us to get out of the contract. And the problem with that determination is, as a matter of law, that doesn't constitute bad faith. That, first of all, under Maryland law, bad faith is only when you do something objectively to interfere with the other party's ability to comply with its obligations. And, second of all, the contract itself. As the judge herself says. Why is that inferable on these facts? Given the fact that you tried so hard to extend the ruling on access, you filed a motion in that regard, as Judge Agee alluded to, to push the court's determination with respect to your right of access past the cure period. Because we were looking for a basis for altering the contract, escaping the obligations. My question is whether the district court was entitled to consider that as evidence of intent or good faith on your part. She was entitled to consider it as evidence of good faith. The problem is the conclusion that it constitutes bad faith. There's no evidence. And she didn't find that we came on the property or were trying to come on the property to obstruct their ability to comply with their obligations. There's no finding like that. But wasn't she even more precise where she said you were not trying to enter the property for the purpose of conducting those tests? No, she didn't say that, Your Honor. She's very clear. She said several times in several orders we were coming on the property, in her view, to delay and ultimately avoid obligations. And all of the evidence she's citing and what she's talking about is to find a reason not to close. And that's what the access right is all about. That's why it exists. We're trying to get on the property to see if there was a reason that the condition present wasn't true. And she says this on page 1177 of the… Why didn't you utilize it? Because at that point we had already declared them to be in default and were of the view that the denial of access was a default in breach of the contract. We didn't need access at that point. The contract did not allow you to unilaterally make that determination until the cure period expired. How do you respond to the district court's clear, express determination that your experts were not credible? The first part is the contract did allow us to declare default, not to declare breach, but to declare default. And we said they were in default for denying us access as the magistrate judge agreed that they were in default. The cure period is all about whether they were in breach, not about whether we could be rendered in breach on May 27th. On the experts, that goes, the experts are on this appeal effectively irrelevant because it's based on her erroneous analysis of the contract. No, it was based specifically, expressly, and clearly on her assessment of their testimony. No, I don't disagree with that at all. That's her reading of the testimony. My point is the testimony went to the question whether or not there was a current problem on the property, Your Honor. That's what it was all about. That's what she held a trial about. The second summary judgment motion said we're going to have a trial about whether there's a material amount. And that asked the wrong question. Thank you very much. We have some time reserved for rebuttal. Mr. Keisler. Good morning, Your Honors, and may it please the Court. Peter Keisler on behalf of Appley I-Star. I'd like to begin where my colleague did with the environmental representations. The Court did find as a factual matter that there was no evidence establishing either that there were material amounts of hazardous substances on the property today or that it had ever been materially used for the disposal of hazardous substances in the past. And Judge Duncan, as you noted, she did this after concluding that Lenar's principal expert was neither credible nor reliable and excluding the pertinent portion of her testimony under Dauber. She concluded that the remainder of Lenar's experts were not persuasive, and she said that I-Star's experts were, quote, highly credible and informative, overwhelmingly so in comparison to Lenar's experts. So if the buyer's complaint was that there's a public relations problem with trying to market this property to consumers because it's now known to have had hazardous waste in the past, does the trial judge's ruling on the testimony of their expert witnesses as far as not being credible, does that vitiate that defense? No, Your Honor. That doesn't address that point. That point is addressed otherwise. So two things, Your Honor. First of all, with respect to the materiality on the issue of historical use, which the Court asked about, Judge Keenan's description of the standard the district judge applied is correct, of course. She asked, would this affect the intended use of the property, which is the construction of a residential development? And Lenar put in zero evidence below that there was any stigmatic effect with respect to current buyers. Did they have anything about this in their opening brief?  And if you look, Your Honor, at page 22 of their reply, that's where they first raise it. And I would point the Court to the two citations they provide on page 22 for their claim about stigma. One is for their claim about stigma, the idea that the application of biosolids in the past would have had a stigmatic effect on buyers today. They cite only two things. One is a page from their opening brief, which cites nothing from the record. And the other is an Internet link to an NBC News California story about a site in California, which was called the most contaminated site in the state, a place where there had been rocket and nuclear accidents, and it was toxic for that reason. Nothing to do with this site. There is zero in their brief because there is zero in the record that suggests there was any. Does that constitute waiver of the stigma? Absolutely, Your Honor. And even if they hadn't waived it, there would be no evidence they could point to in the record to support it. The evidence does show that Lenar itself has built properties on land through a sewage sludge and biosolids have been applied. The EPA has said this can often be beneficial to the land. So there is no automatic presumption or even likelihood that merely the application of biosolids in the past would have caused stigma that would affect buyers today. And the other point, and it's independently dispositive of their historical use claim, is that sludge or biosolids, that's not a hazardous material under the contract. The contract defines hazardous materials as those materials that are regulated as hazardous materials under federal or Maryland law, and both federal and Maryland law, as Judge Chazanow found, specifically exclude sewage sludge as a hazardous material. And the district court further in the trial analyzed the question of whether this particular sewage sludge had contributed material amounts of any other hazardous substance to the land. And she found, as a matter of fact, based on the expert testimony, that this particular sewage sludge had not. So both because the sludge is not itself a hazardous material and thus doesn't come under the representation provision at all, and because there was zero evidence of the stigma claim that was raised for the first time in the reply brief in this appeal, the holding on the environmental representations was absolutely correct. With respect to the issue of access, as the court noted, the sellers granted access to Lenar before the end of the cure period. And Lenar's response to that was telling. Lenar didn't, as Judge Chazanow found, avail itself of the access it had been offered. Instead, it sent a letter days later terminating the contract. And that tells you three things. First, it confirms that the request for access was in bad faith. They never wanted it because they didn't use it when it was offered. Second, it confirms that even if there had been a breach, it would be immaterial, because it cannot be a material breach of a contract to deny access to a party who doesn't want it and doesn't use it when it's offered. And third, it means that their termination letter days later was, as the district court found on JA4830, itself unlawful, because it cited as the basis for termination the denial of access when access had, in fact, been offered days before. And, in fact, Lenar's president testified on the stand that when he signed the letter terminating the contract on July 3rd, he said he didn't even know that access had been granted days earlier. He didn't know because his subordinates didn't bother to tell him. They didn't bother to tell him because it was irrelevant to them. And it was irrelevant to them because this was part of the plan all along, which was to terminate the contract regardless of access. And that gets to the findings of fact, Judge Keenan, that you mentioned earlier. Lenar says it is not challenging the district court's findings of fact, but it can do so only by mischaracterizing what the court found. The court did not find, as my colleague suggests, that it was evidence of bad faith, merely that Lenar privately hoped that when they got on the land, they would discover a legitimate basis for terminating the contract. What the district court said specifically was that this was a pretext, an effort to, quote, delay closing while Lenar settled on a strategy to evade its contractual obligations and to, quote, contrive a technical default. And that was consistent with the internal Lenar documents, which said that their strategy and approach to the sellers was to, quote, stonewall them. Their strategy for the contract was to, quote, terminate it. And that this was all going on at a time when Lenar's presidents testified on the stand, we had no reason to believe there was anything wrong with the property. And Lenar asks in its brief, well, how could a request for access delay closing? Either we find something or we don't. But the district court explained exactly how this works. The request for access was being used as a way to raise claims that Lenar knew were unfounded, but which they would allegedly say required more and more investigation and would serve as a pretext for them to boycott the closing. Specifically, Judge Chazenow said that they had offered a, quote, laundry list of issues in the course of requesting access that had already been addressed and resolved. And they were doing this as a way of claiming that more investigation was needed to avoid closing. And this closing date was very important to the sellers. They had negotiated a reduction in the purchase price of $70 million in exchange for specific performance on a specific timetable. And the boycotts of the closing, the refusals to engage, the raising of bogus claims that Lenar knew had been already resolved, those were all ways to undermine the contractually agreed upon obligation of specific performance on a specific timetable. Judge Niemeyer said in the J.D. Associates case that bad faith is attempting to frustrate the ability of the other party to obtain the benefits they negotiated for in the contract. And this was textbook bad faith. And my colleague simply doesn't come to grips with what the district court actually found was going on here. And because that's what was going on here, Judge Duncan, as you said, they had no absolute right of access to the property. The property granted them the right to request access. It was subject to the approval of the sellers in each instance. And what the district court held, and Lenar doesn't dispute this, is that that was subject to a reasonableness standard. Access could be denied if it was reasonable to do so. And that's why Lenar's complaint charged the sellers with unreasonably denying access. But it cannot be unreasonable to deny access when the request is made in bad faith for the purpose of delay and when it is immaterial because they don't want access anyway and don't avail themselves of it when it is offered. If the court has no further questions on those issues, then I will yield back the remainder of my time. Counsel, what's your response to opposing counsel's argument that your stigmatization argument as to the materiality provision has been waived? Several responses. First of all, turning to appeal, we clearly explicitly address this in our opening brief. In the summary of argument, we raise the historical use, the failure of the historical use condition on page 16. On page 35 to 36, we say the representation about historical use wasn't true. On page 41 to 42, we say the historical use representation wasn't true. And the court erred because by ignoring the historical use representation, she did the materiality analysis wrong. All right. That's the fundamental error. The court didn't specifically address the stigmatization of the property. And that goes to the question at trial, we were not allowed to make that argument. Right, but where are you discussing that in your brief? The stigmatization, the damages that result from the popular perception that people don't want to live. That's mentioned where Mr. Keisler say it's mentioned. But the problem is we weren't allowed to deal with that at trial. That's the problem. I can't give you evidence. Wait a minute. Where exactly? Give us a page in your brief where you say that argument's made. Page 42 of the brief. A reasonable developer instead would be concerned with any amounts or history of massive dumping that might concern potential residential purchasers. Ordinary home buyers, Your Honors, are not CERCLA experts and would not breezily ignore the fact that potentially poisonous PCBs or thousands of tons of hazardous materials have been poured into their backyards and playgrounds merely because the developer tells them that none resulted in toxicity levels requiring mediation. The word stigma doesn't appear there, but the point is unambiguous. And the problem now on appeal is Mr. Keisler points out that we didn't introduce evidence of stigma at trial, but that's because the court didn't allow it. She said at summary judgment, here's what you're going to try. And then she says in her findings of fact and conclusions of law at page JA4800, here's how she describes it, having described her own opinion. In light of that interpretation of 11A and 12D, she's saying it's a contract interpretation, the burden at trial fell upon purchaser to prove that sellers' environmental representations and warranties were not true in fact. Talking about the burden, what was it? Therefore, it was incumbent upon U.S. Home to demonstrate by a preponderance of the evidence, one, that there are hazardous materials on the property as that term is defined in the purchase agreement, two, that the source of those hazardous materials was something other than what was disclosed, and three, that those hazardous materials are present in amounts such that remediation of the property is required. It's a perfectly accurate description of... Have you raised here, though, as an assignment of error, the denial of the ability to introduce the stigmatization evidence? Not in those terms, no. But I don't think that matters with respect, Your Honor, because we have challenged her error in saying and approaching the whole trial all the way back to her first summary judgment opinion. That's where the error occurred. We made this argument, the very first summary judgment argument in 2009. We said, this case is a simple case, and it's still that simple, Your Honors. There was supposed to be no portion of the property used for historical dumping. That's not true. Thousands of tons of sludge have been dumped. Right. And she said that's not sufficient. Her argument is that the stigmatization is the basis for our ability to claim that we're not required to perform, but you have no evidence of that, and you haven't assigned it as an error by the district court. How are you able to present that claim now? Because she made the error early on and said, here's what the trial is going to be about. There's no point. We couldn't have introduced evidence of stigma, because the only issue she wanted to hear evidence on, Your Honors, there's no ambiguity about this, was the current state of the property, whether something was required to be legally remediated today. And that just reads out of the contract, Romanet 2. The error occurred in 2009 when she said, that's what I want to hear about, the current state of the property, not the fact that there was this historical use, which unambiguously falsifies the required condition precedent. I don't think there's any way out of that point. And the fact that there's no evidence is just a consequence of what it is she said the trial was supposed to be about. And if I could address Mr. Keisler's point about sewage sludge again, the EPA tells us. This is not a factual determination. It's a legal determination that she made when she says in the findings of fact conclusions of law that sewage sludge is not a hazardous material because it's exempt from Federal laws. The Federal law, she cites, is the Solid Waste Disposal Act. And that exempts sewage sludge because it's regulated by the Clean Water Act. That's what regulates sewage sludge. And the EPA, and here's why, the EPA says they regulate sewage sludge under Rule 503. Rule 503 says it exists, quote, to protect public health and the environment from reasonably anticipated adverse effect of certain pollutants in sewage sludge. If you look at 503.13, there's a table of all the pollutants that could exist in sewage sludge. That easily satisfies the definition of hazardous materials under the contract, and it's unambiguously material because the parties themselves said that it's material that the purchaser is entitled to know if the property, in fact, had been used for that kind of use. Thank you. Thank you very much, Mr. Hacker. Your time has expired. We will come down and greet counsel and take a brief recess.
judges: Allyson K. Duncan, G. Steven Agee, Barbara Milano Keenan